[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
The jury in this civil action returned a verdict for the plaintiff for damages in the amount of $26,604.58 on November 7, 1991. In response to specific interrogatories the jury found that the negligence of the defendant was the proximate cause of damages to the plaintiff in the form of economic loss; that the plaintiff was induced to rely to its detriment in the form of economic loss on the negligent misrepresentation by the defendant of material information known to the defendant; and that the plaintiff's damages had been reduced by 35% for its comparative negligence. Judgment for the plaintiff for $26,604.58, plus prejudgment interest of $9,896.90, and costs was entered forthwith.
The defendant moves for a new trial on the usual grounds that the verdict was against the law, against the evidence and against the law and the evidence and the weight thereof. The defendant alleges several additional grounds for its motion, claiming in substance that the Court erred in submitting any issues to the jury for decision. All of these contentions were raised and overruled by the Court on the defendant's motion for directed verdict. If the Court erred in its rulings of law during the trial, those errors may not be addressed on a motion for a new trial under Rule 59. Evora v. Henry, 559 A.2d 1038, 1041 (R.I. 1989); Dennehy v. Maycourt Realty Co., 90 R.I. 245, 249,157 A.2d 659, 661 (1960).
Under the Rule and the common law the Court is required to review the evidence independently in the light of its charge to the jury, to assess the credibility of the witnesses, to draw such inferences as it finds reasonable and to reach its own conclusions as to whether the evidence preponderates for or against the jury's verdict and whether the jury followed the law given in the Court's instructions. If the Court's conclusions agree with those of the jury, the inquiry is at an end and the motion must be denied. If, on the other hand, the Court does not agree with the jury, a further step is required. If the Court's disagreement falls within that area where reasonable minds might differ, the verdict will not be disturbed. If, however, the Court is satisfied that the evidence preponderates against the verdict, fails to respond to the merits of the controversy, or fails to do substantial justice between the parties, then the verdict must be set aside and the Court must order a new trial. See, Fox v.Allstate Insurance Co., 425 A.2d 903 (R.I. 1981).
The plaintiff called Wayne Elliott as its first witness. He testified that he is currently a vice-president and the chief financial officer of the plaintiff. He held those positions in 1986. During the summer of that year the plaintiff decided to explore the concept of a self-insured employee health insurance plan, whereby the plaintiff would pay its employees health care expenses under a plan adopted by the plaintiff.
On June 19, 1986 the defendant made a written proposal to the plaintiff, which was received in evidence as Plaintiff's Exhibit Number 1. According to page 6 of its proposal it was prepared to include among its services:
 "11. Placement of Stop-Loss Insurance.
 12. Monitoring of claims for Stop-Loss Coverage."
On page 7 of its proposal the defendant points out as one of the advantages of self-insurance:
 "The administrator monitors claims and sends substantiating information to the stop-loss carrier. Reimbursement is made directly to the Employer."
On page 10 of the proposal the defendant identifies itself as:
 "4. Broadest stop-loss market of any third-party administrator in New England, plus full independence in the selection of the stop-loss carrier."
The Court finds from the foregoing uncontradicted evidence that the defendant held itself out to the plaintiff as an expert specially skilled in the placement of stop-loss insurance coverage and in making claims against the carriers of that kind of insurance.
On September 11, 1986 the parties entered into a written agreement, Plaintiff's Exhibit Number 2, with respect to the administration of claims made by the plaintiff's employees against the plaintiff for health care benefits. That agreement is silent with regard to the placement of stop-loss insurance and with respect to pursuing claims under such a policy. Since the defendant patently did not agree in that contract to perform any services with regard to stop-loss coverage, Count III of plaintiff's second amended complaint seeking damages for breach of that specific contract was dismissed by the Court during trial on motion of the defendant for a directed verdict under Rule 50 (a).
Upon the advice of William Schwab (Schwab), who was the principal officer of the defendant, the plaintiff placed its stop-loss coverage with Safeco Insurance Company (Safeco). Mr. Elliott testified without contradiction that he relied completely on Schwab's judgment in all matters regarding the stop-loss policy. It was understood from the outset that the procedure that the parties would follow would be for the defendant to receive, investigate and determine the validity of all employee claims and to issue unsigned checks for all valid claims. The unsigned checks would be forwarded by the defendant to the plaintiff for signature and subsequent mailing to health care providers or other eligible beneficiaries. The plaintiff wanted to level its health care benefits over the annual coverage period. The first year of the plan commenced on October 1, 1986.
This witness left the plaintiff's employ in February 1987 and returned in August 1990. The defendant presented no evidence even tending to contradict or impeach the plaintiff's evidence that it justifiably relied on the defendant in all matters concerning stop-loss coverage.
During this witness' cross-examination, Defendant's Exhibit A, the plaintiff's excess loss contract with Safeco was received in evidence. The witness acknowledged having seen some portions of the exhibit but not others. He recognized the excess loss insurance schedule for the period October 1, 1986 through September 30, 1987. He said he never received a copy of the "boiler-plate" portions of the policy. This testimony was uncontradicted and unimpeached.
It appears from Defendant's Exhibit A that until October 1, 1987 Safeco provided excess loss coverage only for individual losses over a $25,000 deductible for each person. On October 1, 1987 Safeco issued an aggregate excess loss coverage with a deductible of $281,245.00. The policy was issued by Mount Vernon Insurance Agency, Inc. through William H. Schwab, neither of whom are parties in this litigation. It is abundantly clear from all the evidence that the plaintiff was never made aware of the existence of Mount Vernon Insurance Agency, Inc., but reasonably assumed at all times that it was dealing with Schwab as an agent of defendant.
Thomas Lyons, the next witness for the plaintiff, was a vice-president and the chief financial officer of the plaintiff from February 1987 until Mr. Elliott's return in August 1990. The employee health benefit plan was part of his corporate responsibility. He testified without contradiction that part of the services rendered to the plaintiff by the defendant was the processing of the plaintiff's stop-loss claim. He continued to rely on the defendant to place the plaintiff's stop-loss coverage. He called on the defendant for advice regarding the stop-loss policy. The person he relied on was "Bill" Schwab. He identified Plaintiff's Exhibit 3 as the defendant's proposal for the first renewal year of the plan on October 1, 1987.
It was the defendant's recommendation to place plaintiff's aggregate stop-loss coverage with Safeco. There was no discussion as to how claims for losses over the deductible were to be handled. He did not get a copy of the Safeco policy at the time the renewal was written. On October 26, 1987 the witness received a letter from the defendant confirming the plaintiff's renewal action. The plaintiff was requested in the letter to sign an enclosed Safeco participation agreement and to return it to the defendant, but, significantly, not to Schwab, Safeco or Mount Vernon Insurance Agency, Inc. Also, the plaintiff was requested to sign and return an amendment to the claims administration service agreement. The letter and enclosures are Plaintiff's Exhibit Number 4. The witness noticed that the enclosures were signed by Schwab, but he was unaware of Schwab's connection with Safeco. In the course of the year the witness spoke to Schwab once or twice but the delivery of claims checks was never discussed. The witness testified unequivocally that the defendant knew that the plaintiff was in the practise of holding up delivery of benefit checks to fit in with its cash flow. The defendant presented no evidence whatever to contradict this credible assertion.
Toward the end of the plan year, on September 24, 1988, there was a meeting at the plaintiff's place of business at which the witness and Schwab were present. According to the witness, Schwab was advised that plaintiff was going to exceed the deductible on its aggregate stop-loss coverage. He was told that the plaintiff wanted the maximum benefit it could get on its coverage. The defendant was told to push through every claim it had in its office so it could be included among the claims for which the plaintiff could claim reimbursement under its stop-loss coverage.
The Court finds from the competent, credible and uncontradicted evidence that the plaintiff justifiably relied on the defendant to assist it to obtain the maximum benefits it could under its stop-loss coverage. The Court further finds from such evidence that the plaintiff was justified in its reliance because the defendant held itself out as especially skilled in making stop-loss coverage claims. The Court further finds that the defendant knew that the plaintiff was relying on it to exercise reasonable skill and diligence in assisting the plaintiff in realizing the maximum attainable benefit under the policy. The defendant also knew that the plaintiff was in the practise of holding up delivery of the checks for some substantial period after they were issued. The Court further finds that the evidence shows that the defendant knew that the plaintiff was ignorant of the fact that checks issued but not delivered or mailed during the policy year would not be included in the aggregate deductible for that year. The defendant actually claims it was equally ignorant as the plaintiff. See Plaintiff's Exhibit 6.
After the meeting on September 24, 1987 the defendant forwarded forty checks for slightly over $40,000 to the plaintiff. Some checks came in by Federal Express. The defendant was pushing claims through as requested. The defendant, however, gave the plaintiff no instructions as to when the checks were to be released. In accordance with the plaintiff's usual practise they were placed in a file cabinet. The plaintiff did not intend to release the checks until it had received reimbursement from Safeco.
The defendant prepared and submitted the plaintiff's claim for reimbursement with Safeco. On January 24, 1989 an auditor from Safeco wrote to the defendant explaining that he was disallowing losses in the amount of $40,930.13 because they had not been paid within the policy year. He pointed to policy language which limited the application of payments to the policy period in which payment was actually made. He came to the logical, inescapable conclusion that benefit checks processed, but not released before the end of the policy could not be payments made during the policy year. The audit report is in evidence as Plaintiff's Exhibit Number 5. The auditor expressed it as his opinion that: "It is the joint responsibility of Anson, Inc. and Mount Vernon Associates to ensure that claims are processed and paid (released to the payee) within the policy year." (Emphasis supplied.) Significantly, the audit report is addressed to the defendant and not the plaintiff. Apparently, Safeco regarded the defendant as the party pursuing the plaintiff's stop-loss claim.
Because the defendant undertook prior to September 30, 1988 to assist the plaintiff in maximizing the plaintiff's claim on its stop-loss coverage, whether it did so gratuitously or as an ancillary insurance service apart from its contractual obligation, the jury was instructed that, if the defendant failed to exercise that degree of care that an ordinary prudent person would have exercised under the circumstances, it could find that the defendant was negligent. Having in mind that the defendant knew that the plaintiff was ordinarily holding up release of benefit checks and also knew or should have known that unless claims were actually paid within the policy year they would not be included in the aggregate stop-loss coverage deductible, the jury was fully justified in deciding that defendant failed to exercise reasonable care when it failed to warn the plaintiff that, if it did not release benefit checks to payees before the end of the policy year, it risked losing coverage for those losses.
The Court finds from its independent review of the competent credible and uncontradicted evidence that the defendant was negligent.
On February 9, 1989 the defendant responded to the Safeco audit letter. See Plaintiff's Exhibit Number 6. That letter contains the disclosure that the defendant had never before made an aggregate stop-loss claim on a Safeco policy. It also contains an assertion that the defendant was unaware that payment meant that a claim had to be processed, and a check issued and mailed before the end of the policy year before the claim could be included in the deductible. The defendant "assumed," but obviously without knowing, that it would be sufficient to process the claim and issue the checks.
The evidence is clear and common sense would dictate that had the defendant warned the plaintiff that checks in payment of claims had to be delivered or released to payees before the end of the policy year in order for them to have been included in the deductible, the plaintiff would have timely released the checks and would have thereafter received an additional $40,930.13 as reimbursement for an aggregate excess loss in that amount. The credible evidence supports the jury's finding, with which the Court agrees, that the defendant's negligence was a proximate cause of economic loss to the plaintiff in the amount of $40,930.13.
The defendant argues that there was insufficient evidence before the jury to establish the element of scienter, that is, that the defendant knew of the risk to which its conduct was exposing the plaintiff. The defendant says that it did not know
that the plaintiff's practise of withholding release or delivery of the claim checks would cause the insurance carrier to exclude those amounts mailed after the end of the policy year from the aggregate amount paid by the plaintiff. The plaintiff points to Schwab's deposition testimony that he knew at the time he made the original proposal to the plaintiff in June 1986 that claims had to be paid during the plan year in order to be included in the deductible of the aggregate stop-loss coverage. The point is plainly expressed at page 3 of Plaintiff's Exhibit 1. But, the defendant urges that, although it knew about the payment requirement, it did not know that the plaintiff's practise would risk such payments not being considered by Safeco as payment within the policy year. In the letter of February 9, 1989 (Plaintiff's Exhibit 6) the defendant vigorously protests that it was equally as ignorant as the plaintiff that the carrier would require mailing of the checks to be a measure of when claims were paid.
There was evidence, nevertheless, from which reasonable jurors could have found by inference that a reasonably prudent person in the defendant's position on and after September 24, 1988 would have foreseen that the plaintiff's practise of holding claims checks would create a risk that those items would not be included among the claims paid before the end of the policy year. A reasonably prudent person would have warned the plaintiff of the risk. The defendant knew or should have known, if it had been in the exercise of due care, that the plaintiff was about to skate on very thin insurance ice, indeed. Even a lay person can perceive the very real danger of not releasing checks until after the end of the policy period. The jury was justified in finding that the defendant had the superior access to vital information about making stop-loss claims, and was fairly chargeable with knowledge of the meaning of the terms of the policy which its principal officer recommended and issued. In such a case, a failure to ascertain and communicate the reasonable requirements of the carrier for payment of aggregate excess loss claims may be found by reasonable jurors to constitute a failure to exercise due care. The requirement of scienter can be satisfied as a matter of fact from the defendant's conduct, since it acted as if it in fact knew what were the elements of a valid claim under the policy, when it either did not, or had forgotten, or simply overlooked telling the plaintiff.
The jury was also charged that it could impose liability on the legal theory of negligent misrepresentation. The jury was told in essence that a party in a business transaction who negligently fails to supply accurate information for the guidance of others in that transaction is subject to legal liability for monetary damages suffered by those other parties if they justifiably relied on his or her failure to provide accurate information. They were also instructed, in effect, that a negligent misrepresentation included a negligent non-disclosure or omission of material fact. The jury was also charged on the doctrine of comparative negligence as to both legal theories of liability.
The Court finds that the defendant held itself out to be specially skilled in pursuing and making claims on aggregate stop-loss policies of the kind issued to the plaintiff; that the defendant had a business relationship with the plaintiff whereby the defendant undertook to assist the plaintiff in maximizing the plaintiff's claim under the stop-loss coverage; that the defendant negligently failed to disclose to the plaintiff that claims must be actually paid by releasing checks to payers before the end of the policy year in order to be included in the aggregate stop-loss coverage for the year; that the defendant knew or should have known of that fact; that the defendant knew that the plaintiff was relying on the defendant's superior knowledge of the basis for making claims under the aggregate stop-loss coverage; that the plaintiff did rely on the defendant's non-disclosure; and that the plaintiff did suffer a detriment in the nature of an economic loss of $40,930.13 for which it would otherwise have been entitled.
Accordingly, the jury's finding that the defendant was guilty of negligent misrepresentation, in the nature of a negligent failure to disclose known material facts, is supported by a preponderance of the evidence.
The jury found that the plaintiff's own negligence was a proximate cause of its own damages. They apportioned the plaintiff's negligence as constituting 35% of the total negligence. Damages were reduced from $40,930.13 by 35% to $26,604.58. The evidence supports this assessment of damages, including the reduction for plaintiff's own carelessness in not reading the policy "boiler-plate."
The motion for new trial is denied.